### 6424.   COONER *v.* THE STATE.

1. Grounds of the motion for a new trial which complain that the court
erred in admitting certain evidence over the objections of the defendant's
counsel, but which fail to state what objection was made at the time it
was offered, can not be considered by this court. *Clarke* v. *State,* 90 *Ga.*
448 (16 S. E. 96); *Dutton* v. *State,* 92 *Ga.* 14 (2), 15 (18 S. E. 545);
*Stevens* v. *State,* 93 *Ga.* 307 (4) (20 S. E. 331); *Huff* v. *State,* 85 *Ga.*
336 (2), 340 (11 S. E. 619); *Griffin* v. *State,* 86 *Ga.* 257 (12 S. E. 409);
*Robertson* v. *State,* 87 *Ga.* 209 (2), 214 (13 S. E. 696).

2. Not only did the evidence introduced in behalf of the State authorize instructions to the jury on the law as to voluntary manslaughter, but the statement of the defendant himself plainly showed an assault upon his person by the deceased at the time of the killing, amounting to less than a felonious assault.

3. The charge of the court is not subject to the exception that the court expressed and intimated an opinion in charging the jury as follows: "If you find that the defendant, without malice and not under such circumstances as would justify or excuse the killing, voluntarily killed the deceased, and that he was impelled to do so by a sudden, violent impulse of passion, supposed to be irresistible, produced by some actual assault upon the defendant or an attempt by the deceased to commit a serious personal injury upon the defendant, or by other equivalent circumstances sufficient to justify the excitement of passion, then the homicide would in law be voluntary manslaughter."

(a) Under the evidence, this charge was favorable to the defendant, rather than against him, and therefore he can not be heard to complain.

4. The defendant made several statements that he killed the deceased; and the reasons given by him for the killing furnished no legal and adequate excuse or justification therefor. The brief of his counsel treats these declarations as confessions, and in the opinion of this court they amounted to confessions of guilt (sufficiently corroborated), and were not simply incriminatory statements. See *Jones* v. *State*, 130 *Ga.* 274 (4), 277 (60 S. E. 840) ; *Pritchett* v. *State*, 92 *Ga.* 65 (5), 66 (18 S. E. 536). The court did not err in not giving in charge to the jury the law applicable to cases founded solely on circumstantial evidence; since the confessions made by the defendant constituted direct and positive evidence of his guilt, and there was no request so to charge. *Barrow* v. *State*, 80 *Ga.* 191 (3) (5 S. E. 64) ; *Moore* v. *State*, 97 *Ga.* 759 (25 S. E. 362) ; *Toler* v. *State*, 107 *Ga.* 682 (33 S. E. 629).

5. Though the evidence authorized a charge to the jury that all admissions should be scanned with care, and confessions of guilt should be received with great caution (Penal Code, § 1031), failure to give such an instruction, in the absence of a timely written request, is not reversible error. *Walker* v. *State*, 118 *Ga.* 34 (44 S. E. 850) ; *Patterson* v. *State*, 124 *Ga.* 408 (52 S. E. 534) ; *Tolbirt* v. *State*, 124 *Ga.* 767 (53 S. E. 327) ; *Nail* v. *State*, 125 *Ga.* 234 (54 S. E. 145) ; *Pierce* v. *State*, 132 *Ga.* 27 (63 S. E. 792) ; *Lindsay* v. *State*, 138 *Ga.* 818 (6), 822 (76 S. E. 369) ; *Cook* v. *State*, 9 *Ga. App.* 208 (70 S. E. 1019) ; *Baker* v. *State*, 14 *Ga. App.* 578 (81 S. E. 805), and numerous other authorities. .

DECIDED JUNE 28, 1915.

Indictment for murder—conviction of voluntary manslaughter; from Charlton superior court—Judge Quincey. December 29, 1914.

*W. M. Olliff, W. B. Gibbs, J. R. Thomas,* for plaintiff in error.
*M. D. Dickerson, solicitor-general,* contra.

WADE, J. It is unnecessary to discuss all the exceptions covered by the foregoing headnotes. We deem it proper, however, to enlarge slightly on two of the headnotes.

1. The first four grounds of the amendment to the motion for a new trial complain that the court erred in admitting certain testimony over the objections of counsel for the defendant, and, as stated in the headnote, the objections actually made *at the time* when the evidence was offered do not appear in these grounds of the motion for a new trial. The first ground recites that "the court erred by permitting and allowing the witness T. W. Vickery to testify, over the objections of the defendant's counsel, as to the statement by P. A. Cooner at and before the coroner's inquest that was held over the dead body of the said B. F. Richardson." Following this, in subdivisions, the movant insisted that the court erred for several reasons therein set forth, but nowhere in that ground or in the subdivisions thereof is it stated or suggested that the objections as to the admissibility of the evidence, urged in these subdivisions, were urged at the time when the evidence was offered and admitted, but, so far as disclosed by the record, the various objections may have been discovered after the trial of the case. The second ground sets forth that "the movant says that the court erred by permitting F. E. Brock, a witness for the State, to testify, over the objection of defendant's counsel, to the statement made by the defendant at the hearing of the inquest over the dead body of B. F. Richardson, for the following reasons," which are set forth in subdivisions of this ground, but it does not appear that the reasons suggested therein why the evidence complained of should have been excluded were suggested or urged when the evidence was offered at the trial.

The third and fourth grounds allege that the court erred in admitting certain testimony, and set out why, in the opinion of movant, the admission of the testimony was erroneous, but, as said in reference to the first and second grounds, it is not stated that these objections were urged at the time when the evidence was offered. The various authorities cited in the first headnote cover the point here discussed.

2. To what is said in the second headnote as to the propriety of the charge of the court on the subject of manslaughter it is not necessary to add anything further than a part of the statement made by the accused at his trial, which was as follows: "He [the deceased] had started to his room, and he said 'I am going to my room.' At that time there was an ordinance here in town against

cursing here in town or in any public place, and I demanded that he go with me before the town council, and he refused to go anywhere, and he continued to curse and raise a disturbance; he appeared to be drunk or drinking and boisterous, and he started towards me. I told him to stop, and demanded two or three times for him to stop, and he continued to come on towards me, and I stepped back out in the hall. I kept backing and backing, and all at once he made a sudden spring at me, and I struck at him with my club in my left hand, and when I struck at him I did not hit him, but the lick knocked his hat off; he caught my arm in some way and grabbed the club I had in my left hand and turned it around. The club had a leather string on one end of it which I had around my wrist here, and when he twisted the club down, it twisted the string on my arm. I grabbed for my pistol—one I had —a 35 special Smith & Wesson, double action, and when I grabbed the pistol with my right hand he continued to twist the club and made a grab at the pistol, and in the scuffle over the pistol it went off. I didn't know Mr. Richardson was shot. I knew the pistol fired, but I did not know he was hit. He came back on me again and hit at me with his other hand. I did not know that he was shot at all until he said he was shot, and I sent after Dr. Williams and Dr. Williams came. I didn't know he was shot. I didn't intend to shoot him, and didn't know he was shot until he said he was." It was testified by several persons who were at the coroner's inquest that in the statement then freely and voluntarily made by the defendant, he did not claim that the pistol went off accidentally. One of them testified that the defendant stated that the deceased "grabbed at the club [the defendant] had in his hand, and that as [the deceased] attempted to get hold of the club [the defendant] pushed him back again and tried to hit him with the club at the same time; he said he did not hit him, but knocked off his hat, and that [the deceased] came back again the third time, . . and when [the deceased] made the third attempt [the defendant] pushed him back and shot him at the same time." The other witnesses present at the inquest testified to the same effect. One of the witnesses testified as follows: The accused "told him he went up there and found this fellow [the deceased] up there, and he said that just as he was trying to arrest him this fellow grabbed hold of his billy, and he said, 'I told him if he came on me, I would

shoot him,' and says he told him three times, and says he shot him. He says, 'I thought he was trying to get into the room in there,' and says he was trying to get in there to get a gun." The evidence discloses that no weapon of any kind, not even a pocket-knife, was found on the person of the deceased or in the other room, supposed to be his room; in this latter room nothing was found but a shirt. Several witnesses testified that the defendant never stated at the inquest that the deceased "jumped on him," but said merely that the deceased "grabbed his [the defendant's] club."

The statement of the defendant, when taken in connection with the evidence of several witnesses to the effect that the defendant confessed to them after the killing that he had intentionally shot the deceased while attempting to arrest him as town marshal for some minor municipal offense, certainly authorized the submission to the jury of the law of manslaughter, since the evidence further showed that there was no marked disparity in size, if any disparity, between the deceased and his slayer, and it was nowhere suggested in any of the proved statements of the accused, or in his statement at the trial, that the killing was necessary in order to save his life, or even that he was acting under the fears of a reasonable man that his life was in danger, but from his own statements it appears that the deceased made or attempted to make an assault upon him immediately before the fatal shot was fired, amounting to less than a felony, which, while not justifying the homicide, may yet have been sufficient to arouse in the mind of the accused an irresistible passion of anger which brought about the fatal shot, without any admixture of deliberation whatsoever. It appears to us that the jury took the most lenient view possible under the evidence submitted to them, and gave to the defendant the benefit of every legal defense which might be extracted from the record as a whole; for, regardless of what may have been the imagined rights and powers which the defendant supposed he was clothed with by reason of the fact that he was marshal of the town, it seems that the homicide was wanton and unjustifiable. It has been said that "a little learning is a dangerous thing;" and it may be said with equal if not greater truth that a little "authority" is often a far more dangerous thing than a little learning. It would be well if town marshals, constables, policemen, and other petty officers could learn otherwise than by sad experience that even those who wear a badge

of authority upon their breasts or carry a club in hand are not above the law, and may not with entire immunity trample under foot the laws and customs established for the benefit and protection of all the people of a democracy, where the will of the majority finds expression in the statutes passed by their representatives and construed by their courts. It would perhaps be hard to convince many petty officers that they are not entitled to carry concealed pistols, or are not justified in shooting down a petty offender who breaks loose from the strong arm of the law as represented by the officer and attempts to flee; but with increasing intelligence and knowledge of the law, and the fearless infliction of punishment upon the officer as well as upon the private citizen who offends, a proper respect for the law of the land, which is above and over us all, to protect our lives, liberty, and property, and to prevent wrong-doing by punishment, may finally obtain. Unfortunately, too often such an officer,

> "Drest in a little brief authority,
>     Most ignorant of what he's most assur'd,
>
>     .    .    .    .    .    .    .    .    .    .
>
>     Plays such fantastic tricks before high Heaven
>     As make the angels weep."
>
> *Judgment affirmed.*